## Chicago & Alton R. R. Co. v. Nicholas Vipond, Adm'r, etc.

1. VARIANCES—*Pleadings and Proof Must Correspond.*—In an action for personal injuries founded upon negligence, the plaintiff will be restricted to proof of the negligence alleged in his declaration.

2. RAILROAD COMPANIES—*Establishing Systems of Signals of Their Own Without the Approval of the Railroad Commission.*—Where two railroad companies maintain by agreement a system of signals of their own at the crossing of their roads, for the benefit of both, and each operates its road in reliance upon such signals and holds out the same to their employes as the one by which they are to be governed in running trains over such crossing, neither company can be heard to say, as against an employe of either company injured while relying upon such signals, that such system had not, in fact, been approved by the railroad commission, and consequently such employe was negligent in relying upon them.

3. SAME—*Estopped to Say that They Had Violated the Law.*— Where two railroad companies maintain a system of signals at their crossing for the benefit of both and for the government of their employes in running trains over such crossing, but without the approval of the railroad commission, neither company ought to be heard to say that it has violated the law in maintaining such signals or misled its own employes or the employes of the other company using such signals.

4. SAME—*Measure of Proof in Actions by Employes Injured While Relying upon Signals Maintained by the Company.*—When two railroads establish and maintain a system of signals without the approval of the railroad commission for the government of their employes at their crossing, and an employe of either company finds such signals long in use, without question, and is injured while relying upon them, as between himself and the companies operating their roads by such signals, he is not presumed, as a matter of law, to be negligent, if he does not know that the railroad commission had not approved such system of signals.

5. INSTRUCTIONS—*As to Operating Railroad Trains at Crossings.*— In an action for personal injuries sustained by an employe of a colliding train by reason of a collision at a railroad crossing, an instruction to the effect that if the employes in charge of the colliding train did not stop within 800 feet of the crossing and ascertain that the way was clear before attempting to pass over such crossing, and if their failure to do so contributed to the injuries complained of, or the collision would have been avoided if such stop had been made by such employes, then the plaintiff can not recover. is properly refused where the crossing is governed by a system of signals adopted by the road.

Trespass on the Case. for personal injuries. Appeal from the Circuit Court of La Salle County; the Hon. HARVEY M. TRIMBLE, Judge, presiding. Heard in this court at the October term, 1901. Reversed and remanded. Mr. Justice BROWN dissenting. Opinion filed April 11, 1902.

C. W. BROWN and A. H. SHAY, attorneys for appellant.

H. H. DICUS and McDOUGALL & CHAPMAN, attorneys for appellee.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

The branch of the Chicago & Alton Railroad Company's lines running from Peoria to Dwight, and the main line of the Atchison, Topeka & Santa Fe Railroad Company cross each other in the City of Streator. For convenience those roads will hereinafter be called the Alton and the Santa Fe, respectively. A short distance southwesterly from the Alton, and parallel with it, another railroad, called "The Three I," crosses the Santa Fe. The general direction of the Alton and Three I roads at the crossing is northwest and southeast, and of the Santa Fe northeast and southwest. About 1:40 A. M. of December 27, 1899, a switch engine of the Santa Fe, running backward and hauling several freight cars, came to said crossing from the northeast, and ran into the side of an Alton passenger train then going over the crossing in a southeasterly direction. The tender, which was ahead of the Santa Fe engine, was thrown from the track and carried to the southeast, and two cars of the Alton train were overturned. Henry Dirkes was fireman on the Santa Fe engine. He sustained various injuries in the collision, which resulted in his death thirteen days later. This is a suit brought by the administrator of his estate to recover from the Alton road, for the benefit of the widow and child of said Henry Dirkes, the loss to their means of support. Defendant pleaded not guilty. Upon a trial plaintiff had a verdict and a judgment for $5,000 and defendant appeals.

The declaration contained three counts. The court instructed the jury to find for defendant under the second

and third counts. The verdict, therefore, is based solely upon the first count. That count charged, among other things, that the Santa Fe engine and cars in question were under the care and management of divers servants of the Santa Fe company, including Dirkes, who were then driving the same toward the crossing of said two roads; that there had been erected at said crossing and was then in use by said railroad companies a semaphore, then under the care of and operated by the servants of said companies, which semaphore was used to indicate to those in charge of locomotives and trains of cars on either of said roads whether or not it was safe to pass over said crossing, the semaphore being composed of red and white lights, white indicating safety, and red indicating danger, so that when the red light was displayed on the track of the Alton road it was the duty of its servants, running and operating locomotives and trains of cars, to stop and not pass over said crossing till the white light was displayed. The count further averred that while said Santa Fe locomotive and train, with Dirkes, fireman on said locomotive, were moving toward said crossing on the night in question, said semaphore showed a white light on said Santa Fe road, indicating said locomotive and train of cars had the right of way and could cross in safety, and at the same time showed a red light on the Alton road, indicating danger, and making it the duty of the servants of the Alton driving its locomotive and train toward said crossing, to stop and not to attempt to drive said locomotive and train over said crossing till a white light was shown; that said servants of the Alton carelessly and improperly drove its locomotive and train over said crossing while said red light indicated to them it was dangerous to cross, and without stopping, as was their duty, and thereby the two trains came in collision and Dirkes was injured, and thereafter died of said injuries. It was also averred Dirkes was exercising due care. There were proper averments as to the widow and child and the granting of letters of administration to plaintiff.

The only negligence charged against defendant by the

first count was that its servants ran its locomotive and train over said railroad crossing when a red light showed them it was dangerous to cross, and when by reason of said red light displayed to them it was their duty to stop and wait till a white light was shown. The proof showed that at the crossing of the Santa Fe and Alton there was a semaphore, and another at the crossing of the Santa Fe and Three I, both on the southeast side of the Santa Fe track, and both operated by the same lever some distance northeast of the Alton track along the Santa Fe track, the lever conveying the desired movement to the arms of the semaphores by means of two wires. The semaphore was always kept set to show a clear track for the Santa Fe, and to show danger to each of the other roads, except where a locomotive or train of either the Alton or Three I desired to cross the Santa Fe, and then a danger signal was shown to the Santa Fe, and the signal for a clear track to the other roads. At night the danger signal was a red light, and a white light was a signal for a clear track and the right of way. The lights in the semaphore at night were white. The red light was obtained by dropping in front of one of the white lights a red glass placed in an arm of the semaphore. Witnesses testified the semaphore was so constructed that both white lights could not be shown at the same time, if the semaphore was in proper repair. If, however, the red glass was broken, or had fallen out, then the semaphore would show a white light to both roads. It was also in proof that when the arm was half way over it would show to each road a light half red and half white.

The plaintiff proved by numerous witnesses that at and just before the collision both semaphores showed a white light to the Santa Fe. The person whose duty it was to change the signals when required, testified he had not changed the signals for at least thirty minutes. Another witness for plaintiff testified to the best of his recollection the signals had not been changed for thirty minutes. No proof was introduced that at the time of and just before the accident the semaphore showed a red light to the Alton,

except the inference to be drawn from the fact that the semaphore was so constructed that if in due repair, and with the red glass in place, it must show a red light to the Alton when it displayed a white light to the Santa Fe. When the tender was thrown off the track to the southeast by the collision, it was thrown against and knocked down the semaphore, and that was dragged some distance. It was proved by plaintiff that after the collision it could still be seen that the semaphore had shown a white light toward the Santa Fe, but no effort was made to show what the condition then was of the part of the semaphore which, when in place, was turned toward the Alton. Plaintiff relied solely upon the testimony that the semaphore when in order could not show a white light to the Alton when it showed a white light to the Santa Fe, and upon the unquestioned proof that at the time of the collision it did show a white light to the Santa Fe.

The Alton passenger depot was about a block and a half from the crossing, and the track from the depot to the crossing was straight. The passenger train in question was on time, and its time was known to the man in charge of the semaphore lever, and to the man running the Santa Fe switch engine. The passenger train stopped at the depot about four minutes to discharge and take on passengers and baggage. The engineer of the passenger train testified that while at the depot he noticed the lights at the semaphore and they were white and that he continued to see them white until about the instant of the wreck. He testified no red light was shown to his train that night. The fireman on the passenger engine testified that he noticed the semaphore light as soon as the passenger train came up to the depot, and that it was white; and that he saw the light all the way from the depot to the crossing, except while putting one shovelful of coal into the furnace, and that after putting in the coal he looked again and saw the light was still white, just as they were at the crossing. The conductor of the passenger train testified that he noticed the semaphore while he was at the depot platform, and it

was white, and that the light was white when the train left the depot platform. The brakeman on the passenger train testified that he saw the semaphore light just as they started from the depot, and it was clear white. The cross-examination of these witnesses did not in any way weaken their testimony, nor was any other evidence introduced which tended to rebut their statements. To this proof is to be added the ordinary instincts of self-preservation. Plaintiff's proof was that this semaphore was always set red against the Alton except when changed to let a train or engine of the Alton or Three I over the crossing. This passenger engineer would therefore be called upon by his duty to look before he left the depot and from thence until he reached the crossing to see if the signal of danger was displayed—to see if the semaphore was set against his train. To attempt to go over the crossing against the red light, or without looking to see whether the light was white or red, would be to imperil his own life and the safety of the train. The same motives would naturally operate upon the mind of the fireman. It would also be natural for the conductor to look at the signal before leaving the depot. Plaintiff called the man who put the lights in the semaphore that night, and also the man whose duty it was to operate the lever which controlled the semaphore, but did not offer any proof that the semaphore was in good repair that night and the red glass in place, nor was the construction of the semaphore described except by the general statement of witnesses that it was so constructed that it could not show a white light to both roads at the same time. In this condition of the proof we are of opinion the jury were not warranted in finding, as they must have done to support their verdict under the first count of the declaration, that a red light was displayed to the Alton road. In our judgment the reasonable conclusion from the proof in this record is that the semaphore was in some way out of repair, or the red glass out or misplaced, so that the semaphore showed a white light to each road. We are of opinion the case should be submitted to another jury upon the facts.

The switch engine and cars of the Santa Fe which were in the collision started from a point 1,000 feet from the crossing. They did not stop thereafter before the collision. Section 12 of the act of 1874 in relation to fencing and operating railroads, as amended in 1885, is as follows:

" All trains running on any railroad in this State, when approaching a crossing with another railroad upon the same level, or when approaching a swing or drawbridge, in use as such, shall be brought to a full stop before reaching the same, and within eight hundred feet therefrom, and the engineer or other person in charge of the engine attached to the train shall positively ascertain that the way is clear and that the train can safely resume its course before proceeding to pass the bridge or crossing."

The court refused instructions numbered 12, 15, 16 and 17, requested by defendant. They were based upon the foregoing section of the statute, and were to the general effect, that if the persons in charge of the Santa Fe switch engine did not stop within 800 feet of the crossing and ascertain the way was clear before passing over the crossing, and if their failure to do so contributed to the injuries complained of, or if the collision would have been avoided if said statutory requirements had been observed by the persons in charge of the Santa Fe engine, then plaintiff could not recover. As already stated, the first count charged that the Santa Fe engine and cars were under the care and management of, and were being driven toward said crossing by, certain servants of the Santa Fe company, including Dirkes. It is argued that this averment binds plaintiff, and that under that allegation and the proofs, Dirkes, with others, drove said switch engine and cars to the crossing in violation of law, and that said violation of law was negligence on the part of Dirkes precluding a recovery by his administrator. Plaintiff supports the refusal of said instructions in part by section 1 of the act of 1887 in relation to interlocking and automatic signals, as amended in 1891. It is as follows:

" That when and in case two or more railroads crossing each other at a common grade, or any railroad crossing any stream or harbor or swing or drawbridge shall, by a sys-

tem of interlocking and automatic signals, or by other works, fixtures and machinery to be erected by them, or either of them, render it safe for engines and trains to pass over such crossing or bridge without stopping, and such system of interlocking and signals, works or fixtures shall first be approved by the railroad and warehouse commissioners, or any two of them, and a plan of such interlocking and signals, works and fixtures for such crossing designating the plan of crossing shall have been filed with such railroad and warehouse commissioners, then and in that case, it is hereby lawful for the engines and trains of any such railroad or railroads to pass over such crossing or bridge without stopping, any law, or the provisions of any law, now in force to the contrary notwithstanding; and all such other provisions of laws contrary thereto are hereby declared not to be applicable in such case. Provided, that the said railroad and warehouse commissioners shall have power in case such interlocking system, in their judgment, shall, by experience, prove to be unsafe or impracticable, to order the same to be discontinued."

Another act, also adopted in 1891, set out in detail the method to be pursued before the railroad and warehouse commission to procure an order for the erection and approval of interlocking signals or other safety devices at the crossing of two railroads, and authorized the issue of a permit by the commission empowering the several companies operating the tracks involved "to run such crossing without stopping, under such rules and regulations as may be in force, or may hereafter be adopted, by the said commission, any law now in force upon the subject of stopping trains at railway crossings to the contrary notwithstanding." Defendant argues the system in use at the crossing here in question is not shown by the proof to have been approved by said commission, and therefore the semaphore did not excuse Dirkes for not stopping within 800 feet of the crossing, as required by the act of 1874.

While the semaphore in question seems to have been operated solely by persons in the employ of the Santa Fe, it is clear from the proofs it was maintained by some arrangement between the Santa Fe and the Alton, and for the benefit of both companies, and that each company operated its road in reliance upon this signal. We think it

obvious from the proof that this signal was held out by both companies to their servants as one by which they were to be governed when they had occasion to run trains over the crossing. In such case we are of opinion that neither company can be heard to say, as against a servant of either company injured while relying upon such signal, that it had not in fact been approved by the commission, and therefore the servant was negligent in relying upon it, nor that such a servant must prove that the companies operating their roads by the signal had acquired the legal right to do so. Neither company ought to be heard to say it has violated the law or misled either its own servants or the servants of another company using the semaphore with them. As applied to this case the result of the principle embodied in the instructions now under consideration, would be that every person in charge of an engine or train approaching a railroad crossing where his company maintained and relied upon a semaphore, or system of interlocking and automatic signals, would be obliged to ascertain for himself whether the system had been approved by said commission, under peril of being conclusively held personally negligent if it had not been so approved, and he was injured by relying upon the signal. We can not accede to this proposition as here applied. If he finds the signals long in use, without question, and apparently treated by both companies as proper to be relied upon, and has no knowledge they have not been approved and that the companies are violating the law in relying upon them, we do not think that as between himself and the companies operating their roads by such signals, the court should instruct the jury that if he is injured at such a crossing while relying upon such signals, he is conclusively presumed as a matter of law to be negligent if he does not prove the commission had approved the system.

The judgment is reversed and the cause remanded for a new trial.

Mr. Justice BROWN dissents from so much of the foregoing opinion as reverses the case upon the facts, but concurs in the views therein expressed upon the refused instructions.